John E. SLAUGHTER, Appellant,

v.

The TEMPLE LUMBER COMPANY et al., Appellees.

No. 13001.

Court of Civil Appeals of Texas.

Houston.

Nov. 14, 1957.

Rehearing Denied Dec. 5, 1957.

Jim S. Phelps, Houston, for appellant.

Fulbright, Crooker, Freeman, Bates & Jaworski, Chester M. Fulton, Houston, for appellee, Temple Lumber Co.

Reid, Strickland, Gillette & Ramsey, Wm. B. Ramsey, Baytown, for appellees, Banks, Sherwood and Jacob.

WERLEIN, Justice.

Appellant, John E. Slaughter, filed his original petition on May 7, 1951, against the appellee, the Temple Lumber Company, alleging in substance that he was a painting contractor and that in April, 1948, he entered into an agreement with the Temple Lumber Company at Baytown, Texas, through its agent, A. L. Banks, to paint a new house then and there under construction by appellee. Thereafter appellant, at the special instance and request of said appellee, painted other houses and buildings in Baytown, Texas. Appellant alleged that "each house and building painted by plaintiff constituted a separate agreement between plaintiff and defendant." In his original petition, appellant attached as Exhibit A a list of houses or buildings painted by him, showing the agreed price between appellant and said appellee for the painting thereof. The appellant did not, however, either in the body of his petition or in his prayer, state the amount of money that was due him by appellee, but in his prayer he asked that the court appoint an auditor and that he have judgment for the amount that on accounting should be found due and owing him. He also prayed for general and special relief.

On April 11, 1952, appellant filed his first amended original petition in which, for the first time, he brought in as defendants the appellees, A. L. Banks, A. L. Jacob, and J. E. Sherwood, claiming they were the owners of all of the capital stock of Baytown Homes, Inc., a Texas corporation, domiciled in Goose Creek, Harris County, Texas. In this petition he also alleged that "each house and building painted by plaintiff constituted a special agreement between plaintiff and defendant." In this first amended original petition, however, he did allege that the appellee, Temple Lumber Company, was indebted to him in the sum of $5,936.20.

He also asked for an accounting, and attached Exhibit A showing the jobs which he claimed he had completed for said appellee. In the alternative, he pleaded that if it be shown that he did not make the several contracts as shown by Exhibit A with the appellee, Temple Lumber Company, then the same were made with Baytown Homes, Inc., through its duly authorized officer, A. L. Banks, and that such company was duly indebted to the plaintiff in the amount sued for. He further alleged that the appellees, A. L. Banks, A. L. Jacob, and J. E. Sherwood, were the only stockholders of said Baytown Homes, Inc., at the time of its dissolution and that they, therefore, became personally liable to the appellant for the amount of the indebtedness owing by said Baytown Homes, Inc.

In his second amended original petition, filed April 8, 1954, appellant alleged that after each job there would be a settling of the account between appellant and appellee, Temple Lumber Company. In this second amended original petition, appellant for the first time alleged a trust agreement between appellant and Temple Lumber Company under which it was agreed that the profits accruing to appellant should be held by Temple Lumber Company, in trust, and that when and if the amount so held in trust became sufficient said appellee would upon request of appellant build a home for him and transfer the same to appellant as a part of the settling of the trust account.

In his third amended original petition, filed April 26, 1954, appellant alleged, "Plaintiff in the latter part of May, 1949, after*ing* seeing that he was not going to get the home transfer*ed* to him by the Defendant, Temple Lumber Company, * * *, made demand upon the Defendant, Temple Lumber Company, to give him the amount that the said Defendant was at that ime holding for him."

In his fourth amended original petition, appellant reiterated the allegation, as he had in his third amended original petition, that "at the end of each job there would be a

settling of account between them." He also alleged a trust agreement relative to the house, claiming that the house was finished in October, 1948, but said appellee failed to turn it over to appellant.

The case finally went to trial on appellant's fifth amended original petition filed November 28, 1955, and his trial amendment thereto filed December 13, 1955, and appellee Temple Lumber Company's fourth amended original answer and trial amendment thereto filed December 9, 1955, and the third amended original answer of the appellees, Banks, Jacob, and Sherwood.

After the appellant concluded his testimony and rested, appellee Temple Lumber Company and appellees Banks, Jacob, and Sherwood filed motions for an instructed verdict. The trial court granted and sustained such motions and instructed the jury to return a verdict in favor of appellees, which was done. The court entered judgment that appellant, John E. Slaughter, take nothing against the appellees. The appellant perfected his appeal, and the case is now before this Court for review.

Appellant has specified two points of error on which he relies. The first point asserts that the court erred in withdrawing the case from the jury and instructing a verdict against him since there was sufficient evidence to warrant submission of appellant's cause of action to the jury. In briefing this point, appellant has at some length reviewed the statement of facts and the testimony of appellant and his witnesses and the exhibits filed in the case. We do not question that there was ample testimony to go before the jury, unless there were certain defensive matters which warranted the court in instructing the verdict against appellant. These defensive matters will be discussed under appellant's second point.

Under Point Two, appellant asserted that the trial court erred in withdrawing the case from the jury and granting an instructed verdict against the appellant on the motions of the appellees since the grounds stated in

their motions were not well taken nor were they supported by the evidence. Appellant has, under his Point Two, taken up the motion for instructed verdict filed by the appellee Temple Lumber Company, in which it was alleged that appellant's cause of action was barred by the two-year statute of limitations, and that appellant had failed to introduce any evidence to rebut the presumption as to the correctness of the auditor's report on file, stating that the appellee was not indebted to appellant; that the appellant failed to introduce any evidence that could form the basis for a verdict and judgment for damages against appellee, and finally, that on the testimony and pleadings of the appellant there had been an accord and satisfaction between them of the claims being asserted by appellant.

Both appellant and said appellee in their respective trial amendments pleaded accord and satisfaction, but, as stated by appellant on page 28 of his brief, his plea of accord and satisfaction was made only in the alternative in the event he should be mistaken about the statute of limitations being tolled as against him. Appellant also contends that the agreement of accord and satisfaction between him and appellee Temple Lumber Company was breached by the latter, and that thereupon appellant rescinded such agreement of accord and satisfaction.

According to his own testimony, the appellant did no further work for Temple Lumber Company after October, 1949. On October 26, 1949, the credit manager of Temple Lumber Company wrote appellant concerning the latter's outstanding indebtedness to Temple Lumber Company. After that date, there were no letters written by Temple to appellant regarding such indebtedness. Appellant had his own auditor, one Louis A. Zeleskey, Jr., public accountant at Lufkin, check appellant's account. This auditor, after checking the account, concluded, as shown in his letter, that Temple Lumber Company was indebted to appellant in the amount of $1,512.56. The auditor, however, gave appellant credit for two payments ($1,900 and $1,901.67) which

appellant admitted he did not make, and which Gordon E. Eldridge, the auditor appointed by the court, found in his report were mere paper transactions in that the credits in such respective amounts were entered on appellant's account and debits in the same amounts were entered on the Baytown Homes, Inc. account.

According to appellant's testimony, there was considerable discussion that went on between him and the Temple officials during the latter part of 1949 and 1950 as to which of such parties was indebted to the other. The evidence clearly shows that there was a bona fide dispute between the parties as to which one owed the other, and that the respective claims of the parties were unliquidated demands.

In his reply brief, appellant strenuously contends that there was no meeting of the minds between him and Arthur Temple, and therefore there was no accord and satisfaction, or in any event the question whether there was an accord and satisfaction was for the jury. In support of his contention, appellant apparently relies solely on the following testimony given by him:

"Q. What is the best you can approximate as to that date when Mr. McNair told you he wasn't going to pay you a penny? A. Well February or March, I'll say the first of March or the last of February I don't know exactly.

"Q. In 1950? A. In 1950 yes sir.

"Q. Then what happened after that, did you ever talk to Mr. Temple or anyone else? A. I went back to Lufkin after that and I saw Arthur Temple at the Hotel Antler and he asked me if Mr. McNair paid me and I said no and he told me he wasn't going to pay me and he told me—he said why don't you just forget about this thing and work with the Temple Lumber Company and be friends like we have always been and I said I'll never agree

to that and I said there is something that might be done about that and Mr. Arthur Temple said I'll go to Baytown and check the records why I didn't go before I didn't want Mr. McNair to think I thought he wasn't doing the job right. After this conversation we drank coffee and a few days later I went to see an attorney, I went to see Mr. Curtis Finley and he told me he would like—

"Mr. Fulton: Objection your Honor, it would be hearsay.

"The Court: It is sustained.

"Q. (By Mr. Phelps) Did Mr. Finley take the case? A. No sir he didn't.

"Q. Did you go see any other attorney? A. Martin Dies, Jr.

"Q. He took the case? A. Yes and called me later that he couldn't handle the case.

"Q. How long did Mr. Dies keep the case, Martin Dies? A. Approximately four or five days."

A careful reading of the statement of facts will clearly show that the above testimony refers to appellant's first meeting with Arthur Temple in February or March or April, 1950, and that it has no reference whatever to their second meeting when the accord and satisfaction was entered into by them. The first meeting took place before appellant went to see the attorneys, Curtis Finley and Martin Dies, in April or May, 1950, whereas the second meeting occurred about September or October, 1950.

Appellant testified that in 1950, after he was unable to get any satisfaction from the Temple Lumber Company officials in Houston, he talked to two different lawyers who would not take his case, and then had a discussion with Arthur Temple, Jr., Vice President of Temple Lumber Company, in which it was suggested by Mr. Temple that both the appellant and Temple Lum-

ber Company forget their respective claims. We quote the testimony of appellant with reference to the accord and satisfaction as follows:

"Q. (By Mr. Phelps) Mr. Slaughter, there's something I've completely forgot to question you about on direct examination and that was the conversation you had with Mr. Arthur Temple in the Hotel Coffee Shop or at least that part of it where it was—where Mr. Temple said we don't know why—why don't we just wipe the slate clean? A. Yes sir.

"Q. That happened in that conversation? A. Like I said Arthur—we drank coffee and Arthur asked me why I didn't come back to Temple Lumber Company and do business and be like it all ways was and they would forget about what I claimed they owed and we owed me and they would wipe the slate clean and that's about the extent of that conversation and I told him that's about all I could do under the circumstances but as far as forgetting it I never would.

*     *     *     *     *     *

"Q. (By Mr. Phelps) Then after you had your conversation with Arthur Temple where he said you would wipe the slate clean did you take any action on this case at all before the letter you said you got in Kerrville and noticed that Temple was still making a demand against you? A. No, I didn't.

"Q. Do you know about when it was that you got that letter in Kerrville? A. No sir, I don't remember exactly when I got it, I had been there—I moved there a short while.

"Q. Do you think you had been there a month or two? A. Possibly two months.

"Q. Possibly two months? A. Yes.

"Q. And you went there on October the 25th, that would be December or

the latter part of December or the first of January in 1951, is that correct? A. Yes, that's just about right, a short while after I moved there.

"Q. And now, after your conversation with Arthur Temple, Jr. where he said he was going to wipe the slate clean were you going to take any action? A. No sir, I wasn't, no sir.

"Q. You were going on the agreement with him to wipe it clean? A. Yes, I thought I couldn't get any lawyer to take it in Lufkin and I might as well forget about getting my money—for me not to owe them and them not to owe me. I had no intention of going to a lawyer, if that's what you mean.

"Q. You were dropping the case? A. That's right, I wasn't going to a lawyer, no sir.

"Q. You were doing just what Arthur Temple, Jr., said wiping the slate clean. A. I did as far as I was concerned, I didn't do anything until the auditor's firm wrote me a letter.

*     *     *     *     *     *

"Q. (By Mr. Phelps) Mr. Slaughter, why did you go see Mr. Clifford Lawrence and turn this case over to Mr. Clifford Lawrence? A. When I got the letter from Temple Lumber Company or their auditor I felt they hadn't kept up with their part of the agreement and that it was necessary for me to file suit to get my money.

*     *     *     *     *     *

"Q. (By Mr. Phelps) I show you defendant's Exhibit No. 6 in evidence and ask you was this the letter you got in Kerrville, the same type as this letter? A. Yes sir.

*     *     *     *     *     *

"Q. Now, Mr. Slaughter, you testified that you decided after your discussion with Mr. Temple there in that Coffee Shop that Temple hadn't lived

up to the agreement that you had, an agreement with Mr. Temple that both of you would wipe the slate clean, and that you would drop it. A. I didn't say I would drop it, he suggested it.

"Q. You decided that would be what you would do because you couldn't get a lawyer in Lufkin. A. I told him I'd decided that I would that I couldn't do otherwise and that would probably be the best thing to do.

"Q. Didn't you just testify you would drop it? A. I don't remember saying I would drop it.

"Q. Didn't you testify after you got this letter in Kerrville that you decided that Mr. Temple was not going to live up to the agreement you made & he made you, and you filed this suit. A. Yes sir.

"Q. Wasn't Temple Lumber Company living up to that agreement? A. They sent me a bill.

"Q. They haven't sued you. A. No.

"Q. Not for a thin dime in connection with that. A. He didn't say they would sue me, just that they would wipe the slate clean.

"Q. As far as you know has Temple wiped the slate clean as of now? A. They sent me a bill.

"Q. That was back in '51. A. They haven't sent me a bill since then.

"Q. Have they sued you? A. No, it is still on the records.

"Q. Now if they would just rub everything off the records would you consider everything as clean. A. No sir, not now.

"Q. In other words, even though Temple hasn't sued you or made an effort to collect the money from you in court you still think Temple breach-

ed the agreement that you had with Mr. Temple, so you should go ahead and sue them. A. I think if it is in the records I should sue them.

"Q. Did he collect the money from you? A. No, sir.

"Q. Did he sue you? A. No sir.

"Q. Wherein did he fail to live up to that agreement? A. If he wiped the records clean would he have had—if he hadn't sent me a bill in Kerrville I would never have sued them.

"Q. That's the reason you sued is because of the bill you received in Kerrville. A. The only reason I sued because they didn't live up to their agreement."

The letter which appellant stated he received in Kerrville was not introduced in evidence nor was its absence explained nor its contents proved, but it was the same type of letter, according to appellant's testimony, as the one introduced as defendant's Exhibit No. 6. This letter was the ordinary type of an auditor's form letter inquiring as to the account of appellant as of October 31, 1948, some two years prior to the date of the accord and satisfaction, and stating in effect that the annual audit made by the auditors, Messrs. Peat, Marwick, Mitchell & Company, showed an indebtedness on open occount in the sum of $2,630.21. The notice stated that it was simply to verify the correctness of the account, and appellant was requested to confirm direct to said auditors whether the amount was in agreement with his records. It was strictly a form letter, and in block capital letters at the top of the letter there was written "This Is Not A Request For Payment." Appellant's contention is that the auditor's form letter constituted a bill and was a breach of the accord and satisfaction agreement.

In his trial amendment, appellant pleaded with respect to such accord and satisfaction as follows:

"Plaintiff further alleges in the alternative that if he be mistaken as to the fact that the statute of limitation had not run against Plaintiff at the time of the filing of his cause of action, and not admitting same, then Plaintiff in the alternative alleges that in September, 1950, that Plaintiff and Defendant, Temple Lumber Company, by and through its Vice-President, Arthur Temple, Jr., entered into a new contract, the terms of which amounted to a promise by Plaintiff and said Defendant to wipe the slate clean, or that since both were claiming that each *of* indebted to the other, both agreed to cancel or drop said claim and wipe the slate clean. That Plaintiff did perform under this agreement and made no further claim of any indebtedness on the part of or against said Defendant, but that shortly before filing of his claim in May, 1951, Plaintiff learned that Defendant, Temple Lumber Company, had breached this new agreement and was still claiming that Plaintiff was indebted to said Defendant whereupon Plaintiff rescended this new contract and sued for what he had parted with, that is his original claim. Plaintiff thus was put back into the position he was in in September, 1950, when he made this new contract. And if Plaintiff be mistaken that he had the right to return to his position as of September, 1950, Plaintiff alleges that the Statute of Limitation was tolled and did not run against Plaintiff after September, 1950, until he elected to rescend said new contract which was at the time of the filing of Plaintiff's original suit in May, 1951. Plaintiff further alleges that said Defendant obtained this new contract by false misrepresentations, that said Defendant would wipe the slate clean, and in view of said misrepresentations, Plaintiff did elect to rescend since rescession of said new contract was the only fair and equitable means left to Plaintiff. Plaintiff is further alleging that this misrepresentation upon which Plaintiff relied and caused him to delay in the filing his cause of action amounted to estoppel, and, therefore, Defendant is estopped to plead the statute of limitation."

The question arises whether under the testimony and pleading of appellant there was, as a matter of law, an agreement of accord and satisfaction entered into by and between appellant and Temple Lumber Company, and second, whether the form letter of the auditor relative to the account for indebtedness of appellant as of October 31, 1948, to Temple Lumber Company constituted a breach of the accord and satisfaction agreement.

■ The Supreme Court of Texas, in Texas & P. Ry. Co. v. Poe, 131 Tex. 337, 115 S.W.2d 591, 592, with respect to accord and satisfaction, stated:

"The doctrine of accord and satisfaction is well established in the law. All parties capable of making contracts may enter into an accord and satisfaction of a claim, disputed or undisputed. The rule is now universally accepted that all claims arising out of contracts, express or implied, irrespective of their subject matter, may be the subject of an accord and satisfaction, provided such contracts are not illegal. * * *

■ "In 1 C.J.S. Accord and Satisfaction § 1, p. 462 a definition of 'accord and satisfaction' is given as follows: 'An accord is an agreement whereby one of the parties undertakes to give or perform, and the other to accept, in satisfaction of a claim, liquidated or in dispute, and arising either from contract or from tort, something other than or different from what he is, or considers himself, entitled to; and a satisfaction is the execution, or performance, of such an agreement.' "

In Minchen v. Vernor's Ginger Ale Co. of Houston, Inc., Tex.Civ.App., 198 S.W.2d 613, 614 (no writ history), this Court said:

"An agreement between two parties to give and accept something of value in satisfaction of a right of action which one has against the other constitutes an accord and the execution of this agreement is a satisfaction. The term accord and satisfaction, therefore, applies to the completed transaction and constitutes a bar to any action on the original contract. Buford v. Inge Construction Co., Tex.Civ.App., 279 S.W. 513.

"An accord and satisfaction is considered a substituted contract within itself and it therefore must be based upon a consideration the same as any other contract. Courts are not concerned with the adequacy of the consideration so long as it is paid and accepted as such, * * *."

In the pleadings of both appellant and appellee, Temple Lumber Company, the agreement between the company and appellant to "Wipe the slate clean" was treated as an accord and satisfaction agreement.

In Wallace v. Larson, Tex.Civ.App. Waco, 199 S.W.2d 198, 200, writ refused n. r. e., plaintiffs and the defendant were operating under a verbal partnership contract to obtain Government contracts for construction work at Camp Hood. The defendant entered into negotiations with the plaintiffs for dissolution of the partnership and an accounting. Later a verbal agreement was made, the terms of which settled the accounts and dissolved and terminated the partnership. As a part of the settlement, plaintiffs agreed to pay the defendant a cash sum and to complete performance of the Government contracts. Later the Government renegotiated the contracts and reclaimed the excess profits. The plaintiffs, in their suit, sought to recover from the defendant one-third of the renegotiation liability. From a judgment for the defendant, the plaintiffs appealed. The Court of Civil Appeals had this to say:

"Accord and satisfaction is a well recognized legal method of discharging any kind of a contract or cause of action, 'whereby the parties agree to give and accept something in settlement of the claim or demand of the one against the other, and perform such agreement, the "accord" being the agreement, and the "satisfaction" [being] its execution or performance.' 1 C.J.S. Accord and Satisfaction § 1, p. 462. See also: 1 T.J., p. 245, sec. 2; 1 R.C.L., p. 177; 1 Am.Jur. p. 215, sec. 1. Although the term or phrase 'accord and satisfaction' contemplates a completed transaction, it is well settled in Texas and in other jurisdictions that a promise to perform the agreement of accord, rather than actual performance thereof, may in and of itself constitute the satisfaction, provided there is an express agreement to this effect or if such is clearly the intention of the parties. Ferguson-McKinney Dry Goods Co. v. Garrett, Tex.Com.App., 252 S.W. 738; Gulf C. & S. F. R. Co. v. Harriett, 80 Tex. 73, 15 S.W. 556; Bost v. Barringer, Tex.Civ. App., 202 S.W. 791; Hudspeth v. Hilburn, Tex.Civ.App., 283 S.W. 314; 1 C. J. S. Accord and Satisfaction § 22, p. 489, and authorities; 1 Am.Jur., p. 254, sec. 69 and authorities.

"From the pleadings, the evidence and the entire record before us we think it conclusively appears that the settlement agreement of March 18, 1943, constituted an accord between the parties thereto insofar as any rights and liabilities arising among themselves under the partnership agreement of April 3, 1942, may be involved herein and that the mutual acceptance of the new promises embraced in such accord constituted a satisfaction thereof. It is evident that both parties so regarded the settlement agreement because each expressly pleaded that it constituted an

accord and satisfaction. By employing such technical terms in their pleadings we must presume that the parties and their able counsel were familiar with the legal meaning and effect thereof and that each intended for both to be mutually bound thereby."

The court appointed auditor, Gordon E. Eldridge, showed in his report to the court covering the account of appellant with appellee, Temple Lumber Company, from August 26, 1948, through May 31, 1950, that the account between said parties which originated during such period was written off the books of Temple Lumber Company's Baytown yard as a bad debt in the sum of $2,329.12. The appellant testified that the only reason that he considered the accord and satisfaction agreement breached by the appellee was that he had received the auditor's letter which he called a "bill" but which, as stated, showed that no request was made for any payment. The agreement between said parties to wipe the slate clean merely meant that neither one would further assert or press his or its claim against the other. There can be no doubt that the Temple Lumber Company lived up to its part of the agreement. It did not press any claim against appellant; it did not sue appellant, nor threaten to sue appellant, nor send him any bill demanding payment; nor did it file a cross-action in appellant's suit. Subsequent to said form letter, neither Mr. Temple nor the Temple Lumber Company made any demand upon appellant for payment, nor in any other way pressed the claim that it had been asserting prior to the accord and satisfaction.

■ Under the pleadings and testimony of the appellant, this Court holds, as a matter of law, that appellant and Temple Lumber Company entered into an accord and satisfaction of their respective claims against each other, and that the form letter which appellant claims was sent to him while at Kerrville, as a matter of law, did not constitute a breach by said appellee of the accord and satisfaction that had been entered into by and between it and appellant.

Since it is our conclusion that the trial court was not only warranted but was required, under the testimony and pleadings of the case with respect to accord and satisfaction, to instruct a verdict in favor of appellee, Temple Lumber Company, against the appellant, no useful purpose would be served by discussing here or deciding whether appellant's claim was barred by limitation, as said appellee contends and as the trial court may possibly have concluded, nor would it serve any purpose to discuss the other grounds asserted by said appellee for an instructed verdict in its motion filed at the conclusion of appellant's case.

It will be noted that in appellant's original petition the defendants, Banks, Jacob, and Sherwood, were not made parties. Indeed, it was not until plaintiff filed his first amended original petition on April 11, 1952, that any claim was asserted by appellant against said appellees. Appellant testified that he left Baytown in 1949 and did not thereafter work for Baytown Homes, Inc. Actually, he testified he never worked out of the Temple Lumber yard after Mr. Banks left in October of 1949. He further testified that he made a demand in June or July, 1949, for the money that he claimed was due him. Under the interpretation of appellant's testimony most favorable to him, limitation began to run on his claim in June or July of 1949, whereas the individual appellees, Banks, Jacob, and Sherwood, were not sued until April 11, 1952

■ Under these circumstances, it would seem beyond doubt that any claim which appellant had against the individual appellees was barred by the two-year statute of limitations, which was pleaded by them. Appellant has alleged certain grounds of estoppel to plead the statute of limitations by Temple Lumber Company. Any such ground of estoppel would not apply to these individual appellees in view of the fact that appellant's own testimony shows that he

became aware, as early as February or March of 1950, that he was being led on and that the promises made him were not going to be carried out. Even if the statute of limitations did not begin to run until that date, still there was a complete bar of appellant's cause of action against the individual appellees since they were not sued until more than two years thereafter. In his trial amendment, however, appellant expressly admitted that the statute of limitations began to run the first part of June, 1949. It is, therefore, our conclusion that the trial court was required to instruct a verdict in favor of appellees on the ground that any claim against them asserted by the appellant was barred by the two-year statute of limitations.

There is another ground upon which the court was warranted in instructing the verdict in favor of said individual appellees. The appellant testified that he was not asserting any claim against them. He consistently testified that the individual defendants did not owe him anything, "They [meaning Banks, Jacob, and Sherwood] don't owe me anything." Later on he testified, "I don't think they owed me anything." He further testified that no one ever told him that Baytown Homes, Inc. owed or would pay him anything, and that he did not even know the individual defendants were being sued; that the first he knew of it was after Mr. Jacob was served with citation and came to appellant's house to inquire about it. He also testified, "I don't claim the Baytown Homes owes me anything."

 Surely appellant will be bound by his own testimony that he is asserting no claim against the individual defendants. The Supreme Court, in the case of Texas & P. Ry. Co. v. Wood, 145 Tex. 534, 199 S.W.2d 652, 654, stated:

"Upon the hearing of the plea of privilege, the mother and father testified unequivocally that they did not assert any cause of action against the railway company. While it is true that there was substantial evidence in the record which, in the absence of these admissions, would have supported an award of damages to the mother and father, still these admissions by the parents of the deceased would have effectively precluded them from recovering anything. As was said in Southern Surety Co. v. Inabnit, Tex. Civ.App., 1 S.W.2d 412, 415: 'The testimony of a party to a suit and admissions made by him must be construed as binding upon him, and not merely as raising issues of fact. His testimony is governed by different rules to those governing witnesses who are not parties.' See also note, 80 A.L.R. 624."

This point seems too clear for further citation.

It is our conclusion, therefore, that the trial court did not err in instructing a verdict against the appellant and in favor of the individual appellees, Banks, Jacob, and Sherwood, and appellee, Temple Lumber Company.

The judgment of the trial court is affirmed.