**TEXAS GULF SULPHUR COMPANY,**
Appellant,

v.

**GLADYS CITY COMPANY et al.,**
Appellees.

No. 7536.

Court of Civil Appeals of Texas, Beaumont.

Jan. 31, 1974.

Motion for Rehearing Overruled
Feb. 28, 1974.

Cleve Bachman, Orgain, Bell & Tucker, Beaumont, for appellant.

Chilton O'Brien, O'Brien & Richards, Beaumont, for appellee.

KEITH, Justice.

Defendant below appeals from an adverse judgment rendered in a trial to a jury wherein plaintiffs sought damages for the breach of a sulphur lease. We will refer to the parties in the posture in which they appear in the trial court.

Defendant is engaged in mining sulphur underlying certain lands of plaintiffs situated upon Spindletop Dome in Jefferson County pursuant to the terms of a comprehensive written agreement fixing its rights, duties, and obligations. During 1968 a controversy arose between the parties as to the location of the development wells on plaintiffs' lands.

In the suit which we review, plaintiffs contended that the defendant failed to perform its obligation to use due diligence in developing the sulphur production on their lands; that it failed to extract all the sulphur from plaintiffs' lands before drilling "line wells"; and it failed to protect plaintiffs' lands from drainage. In addition to the general denial, defendant tendered the defense of accord and satisfaction.

· Upon findings favorable to the plaintiffs, the court entered judgment for plaintiffs in excess of $250,000 and defendant has duly appealed with twenty-six assignments of error, not all of which will be mentioned specifically.

## I. BACKGROUND OF THE CONTROVERSY

### A. The Mining Technique

Spindletop Dome is a salt piercement type dome with a layer of clay, soil, and unconsolidated sediments above a cap rock of porous limestone. Beneath the cap rock the sulphur is a solid in its natural state situated in the interstices of the rock formation. This sulphur bearing formation is located above an impervious formation of

gypsum or anhydrite rock. The sulphur is produced by the Frasch process.[1]

The technique requires the drilling of a relatively large number of wells to produce all of the sulphur under a given tract of land since the formation is impervious to the hot water at great distances from the well bore. Additionally, production from any given well is of short duration.

### B. The Contractual Provisions

The underlying contract between the parties is a comprehensive written agreement dated December 14, 1936; the premises clause, preceding the description of the land, reads:

> "Has Bargained, Granted, Sold and Conveyed and by these presents does Bargain, Grant, Sell and Convey unto the said Grantee above named, his heirs and assigns, all of the sulphur in, on and under the following described land (together with all reversionary rights in and to the sulphur within the metes and bounds of the land described in this grant and for its duration, to which the Grantor, its successors and assigns, may be entitled), subject to the reservations, terms and restrictions herein expressly set forth, to-wit: [here follows description of land]."

This instrument, twenty-one pages in length, contains several provisions necessary to be noted at this point:

1. Once defendant began mining sulphur on the plaintiffs' lands, the contract provided that:

> "[S]uch production and mining shall be pursued with due diligence until all recoverable commercial sulphur under the premises which may be produced in paying quantities is mined and produced or until such time as Grantee [defendant] may elect to finally surrender [the rights] . . ."

2. There was a provision for the drilling of offset wells and a reference to "line wells", these being the words of the parties:

### "Offsets

> "During the term that the Grantee is under obligation to produce sulphur from said lands under the terms of this agreement, or whenever Grantee or assigns has begun mining on adjoining lands (should Grantor elect) Grantee contracts to do whatever is legally required at any time to properly offset any sulphur mining operations upon any territory across the line and adjacent to this land and to promptly and properly offset such adjacent well or wells by promptly drilling for sulphur within this land and to do all things legally required of him to protect the land herein described from drainage; and should Grantee own the sulphur on the adjacent lands, or operate the same under any right, grant or lease, Grantee especially contracts to fairly and in good faith protect the land in this grant from any drainage because of sulphur mining operations on such adjacent lands.

### "Line Wells

> "Except for the purposes of offsetting, as above stated, Grantee contracts to drill no line wells for the production of the sulphur hereunder until after all sulphur has been recovered through wells drilled away from the boundary lines of others on said premises, and that line wells shall be drilled only as are necessary to protect this property from drainage."

### C. The Adjacent Lands

In due time, defendant acquired the right to mine sulphur from lands of others on the dome, including that adjacent to plain-

---

1. The Frasch method of sulphur production utilizes a series of concentric pipes to inject superheated water at 320° F into the sulphur bearing formation. This melts the solid sulphur in place, the solid sulphur having a melting point of approximately 243° F. The melted sulphur, insoluble and heavier than water, flows to the bottom of the well bore while the water flows to bleed wells away from the well bore. Air is then injected into the well bore and the molten sulphur rises to the surface.

tiffs, known as Spindletop Heights. All of the other sulphur leases, except that of plaintiffs, were pooled or unitized and the landowners received their royalties based upon the production of sulphur anywhere upon the dome, including the lands of plaintiffs. Plaintiffs, however, were not parties to any unitization or pooling agreement. Although it is almost impossible to understand precisely the niceties of the price differential in the royalties due plaintiffs and the other pooled landowners for production of sulphur, it seems uncontradicted in our record that sulphur credited to the adjacent Spindletop Heights lands was much less costly to defendant than that produced from plaintiffs' lands.[2]

Tract 41, the only one with which we are concerned, was known to contain a large deposit of sulphur capable of being commercially produced. Jefferson Lake Sulphur Company had drilled a well on the Spindletop Heights acreage in 1942 which confirmed the deposit but the well was not produced. Additionally, defendant had drilled a number of wells (the "300" series) on plaintiffs' lands beginning in 1956 and produced sulphur in commercially feasible quantities. These 300 series wells were spaced from fifty to seventy-five feet apart but were no longer in production when the controversy arose. No commercial development had been undertaken on the Spindletop Heights lands within 600 feet of the dividing line.

### D. The "1100" Series Wells

Without undertaking to develop the area approximately 200 feet in width lying between the 300 series wells and the property line between plaintiffs' lands and those of Spindletop Heights, defendant began drilling the 1100 series wells. The first of this series, No. 1127, "steamed", i. e., it had been drilled and the superheated water was injected into the well bore to melt the underlying sulphur, on January 12, 1968.

This was a "line well" on the precise line between the two tracts. It was located approximately 200 feet due northeast of well No. 327 on plaintiffs' property and about the same distance northwest of the Jefferson Lake Sulphur exploratory well. It was not near any production on Tract 41 and was a producer.

Within a matter of a few months, defendant drilled seven other line wells, each a few hundred feet from its neighbor, but difficulties were encountered with one and it was not steamed. All were producers, two being extremely prolific. Although one well was drilled on the interior of the Spindletop Heights acreage in February 1968, it was not until March that any activity was shown by defendant on the interior of plaintiffs' lands. Before these line wells were depleted in 1970, the series produced 233,654 long tons of sulphur and each adjoining landowner was given credit for half of the gross production.

As we understand the record, defendant was able to obtain production on the interior of both adjacent tracts, but we do not deem it necessary to extend this opinion by relating the details thereof.

Plaintiffs offered proof that the line wells were bottomed at and produced from lower depths than the offsetting interior wells on their lands and were located in a "valley". The two very prolific line wells were bottomed in a formation which the witnesses variously described as being a "bowl", a "trap", a "sump", or a "jug".

## II. THE CONTROVERSY DEVELOPS

On April 3, 1968, having learned of the drilling of the line wells and that production was being had therefrom, plaintiffs' agent inquired of defendant if the royalties were to be divided equally between the owners of the lands adjacent to the line wells. Defendant's counsel advised him that such would be done, the letter being dated April 23.

2. According to PX–10, it was estimated that the saving to the defendant in payment of reduced royalties was in excess of $325,000.

On May 1, 1968, plaintiffs' agent wrote to defendant's counsel complaining of the line wells, the pertinent parts thereof being reproduced in the margin.[3] Defendant did not reply to this letter.

On February 15, 1968 (and upon the 15th day of each successive month thereafter), defendant sent to plaintiffs a royalty check in payment of the royalties on one-half of the production from the line wells. Each such check was deposited and collected by plaintiffs. Each check had a voucher attached thereto and we attach a photocopy of the first of such checks to this opinion as an appendix. The total of the royalties paid by defendant and accepted by plaintiffs from production obtained from the line wells was slightly in excess of $500,000. Production from the line wells ended in March 1970 and shortly thereafter this suit was filed.

## III. OPINION

### A. Accord and Satisfaction

Defendant tendered three requested issues which it contends would have submitted its pleaded defense of accord and satisfaction.[4]

The first four points of defendant are based upon the action of the court in refusing to submit to the jury the three special issues just noted.

In the recent case of Jenkins v. Henry C. Beck Company, 449 S.W.2d 454, 455 (Tex.1969), Justice Steakley restated the rules governing the defense of accord and satisfaction. For the defense to be available, the party relying thereon must establish the existence of six conditions. We will treat each of these conditions so laid down by the court separately.[5]

1. "This defense rests upon a new contract, express or implied, in which the parties agree to the discharge of the existing obligation by means of the lesser payment tendered and accepted."

Defendant made no effort to establish the existence of any new contract, express or implied. Other than offering the testi-

---

3. "Your company reported substantial production during the month of March from these line wells designated as 1127, 1128, 1132 and 1133. Some years ago the wells designated 327, 333, 356 and 372 produced some sulphur. These wells are located north and west from the line wells and are the nearest wells on the Gladys City property except for the recent well 1138 which also produced some sulphur in March. The recovery of sulphur from all of these wells indicates to me the presence of unrecovered sulphur in the unexplored subsurface area between the line wells and the earlier productive wells.

"Your attention is directed to the agreement under which Texas Gulf is presently producing sulphur from our lands and especially to the paragraph entitled 'Line Wells' of that agreement in which it is stated that your company shall not drill line wells 'until after all sulphur has been recovered through wells drilled away from the boundary lines of others.' Obviously, the intent of this provision was to insure that the maximum quantity of sulphur be produced with full royalties before it was required to share royalties with the adjoining owners.

"It appears to me that these recent line wells are being produced in violation of the terms of our agreement and at our ultimate damage. Would you please favor me with a prompt explanation if you believe me in error."

4. Requested Issue No. 1 reads: "Do you find from a preponderance of the evidence that on May 1, 1968, there existed a bona fide dispute between the parties concerning the effect of the production of the line wells by Texas Gulf upon the royalties due Gladys City?"

Requested Issue No. 2 reads: "Do you find from a preponderance of the evidence that Texas Gulf intended that payments made to Gladys City on production from Tract 41 during the period January, 1968 through February, 1970 was considered as full payment for all royalties due Gladys City on production from such tract?"

Requested Issue No. 3 reads: "Do you find from a preponderance of the evidence that at the time Gladys City accepted such payment such intention was understood, or should have been understood by Gladys City?"

5. All quotations are taken from *Jenkins*, 449 S.W.2d at 455, with citations omitted.

mony of its Assistant General Counsel as to his unilateral and uncommunicated determinations and the acceptance of the checks by plaintiffs, no other testimony on the subject was introduced. Thus, there was no evidence of the making of a new contract.

2. "The evidence must establish an assent of the parties to an agreement that the amount paid by the debtor to the creditor was in full satisfaction of the entire claim."

The "entire claim" of plaintiffs was to be paid for the production of all of the sulphur from the interior of their lands *before* there was any production from the "line" wells. Defendant made no attempt to show assent by plaintiffs to any such agreement.

3. "The minds must meet and where resting in implication the facts proved must irrestibly point to such conclusion."

Plaintiffs, as early as May 1, 1968, at the very beginning of the production from the line wells, registered their complaints as to the manner in which defendant was developing their property. Assistant General Counsel, to whom the letter was addressed, did not reply thereto.

4. "There must be an unmistakable communication to the creditor that tender of the lesser sum is upon the condition that acceptance will constitute satisfaction of the underlying obligation. . . . [T]he conditions must be made plain, definite, and certain."

5. "[T]he statement accompanying the tender of a sum less than the contract price must be so clear, full and explicit that it is not susceptible of any other interpretation."

Defendant did not advise plaintiffs, by any written communication, that acceptance of the actual amount which defendant admittedly owed for the production from the line wells would extinguish plaintiffs' claim for improper development. Insofar as this record discloses, defendant did not pay the plaintiffs one dime more than it admitted owing for production from the line wells.

An examination of the voucher attached to this opinion is not a statement that if plaintiffs accept the check an accord and satisfaction will have been accomplished as to claims of improper development. As explained in our record, the information appearing on the voucher simply indicated the production of a certain number of tons of sulphur, the price thereof, and the month of production. Furthermore, it was not a tender of a sum less than the contract price—it was in an amount precisely equal to that which defendant owed upon such date. It cannot be said that the information appearing on the voucher was "so clear, full and explicit that it is not susceptible of any other interpretation" than simple payment of what was admittedly due. Cf. H. L. "Brownie" Choate, Inc. v. Southland Drilling Co., 447 S.W.2d 676 (Tex.1969).

6. "[T]he offer must be accompanied with acts and declarations which the creditor is 'bound to understand'."

All that the defendant could expect plaintiffs to understand from the information on the voucher was that the check was tendered in payment of sulphur produced from line wells. That was not the issue in dispute.

■ We have considered each of the cases cited by defendant,[6] but finding no

6. Defendant cites many authorities supporting its contention, all of which have been examined. Such authorities, in the order of citation, include: Texas & P. Ry. Co. v. Poe, 131 Tex. 337, 115 S.W.2d 591 (1938); Call

of Houston, Inc. v. Mulvey, 343 S.W.2d 522 (Tex.Civ.App., Houston, 1961, no writ); Slaughter v. Temple Lumber Company, 307 S.W.2d 108 (Tex.Civ.App., Houston, 1957, error ref. n. r. e.); Industrial Life Insur-

evidence supporting each of the constituent elements of accord and satisfaction as set out in *Jenkins,* supra, defendant's first four points are overruled.

## B. Failure to Submit "Drainage" Theory

As mentioned earlier, defendant's right to drill "line wells" was limited to those "necessary to protect this [plaintiffs'] property from drainage." Defendant was required to drill offset wells to protect plaintiffs' lands from drainage "because of sulphur mining operations on such adjacent lands." And, as also mentioned earlier, there was no sulphur mining operation on the adjacent Spindletop Heights lands by defendant at the time it began production from the line wells.

Special Issue No. 1, quoted in the margin,[7] which was submitted over objections of defendant, the court's action thereon, and the overruling of its motion for judgment non obstante veredicto, form the basis of several points of error.

This series of points (5 through 11) raises two basic contentions: (a) since there was a limited or qualified right to drill line wells to protect plaintiffs' property from drainage, it was incumbent upon plaintiffs to procure jury findings that such line wells were not drilled to prevent drainage of their property; and (b) the controlling issues made by the pleadings and the evidence were not submitted as required by the language of Rule 279, Texas

Rules of Civil Procedure, in effect at the time of the trial.

Defendant's argument in support of subdivision (a), supra, is:

"The basic finding necessary then was first, whether Texas Gulf drilled to protect Gladys City. Dependent on findings there, Gladys City might or might not be entitled to Special Issue 1 as submitted.

"The question really was whether by drilling the line wells Texas Gulf was in fact doing all things legally required of it to protect the land herein described from drainage. If the jury had been asked that question and answered No, then, and only then, would the Plaintiff have been entitled to an issue pertaining to the line wells under the circumstances. But the court's submission of the case has completely distorted the obligations of Texas Gulf, by placing upon it a burden to produce all sulphur from the land before a line well is drilled. This the contract does not require."

The disposition of these points requires a review of the contract. Since neither party contends that the contract is ambiguous, the intent of the parties must be determined from the language found therein. Newsom v. Newsom, 378 S.W.2d 842 (Tex.1964); Benge v. Scharbauer, 152 Tex. 447, 259 S.W.2d 166 (1953).

Having reviewed the contract and the evidence, we disagree with the contention

ance Company v. Finley, 382 S.W.2d 100 (Tex.1964); American General Life Insurance Company v. Copley, 428 S.W.2d 862 (Tex.Civ.App., Houston—14th Dist., 1968, error ref. n. r. e.); McCarty v. Humphrey, 261 S.W. 1015 (Tex.Comm.App.1924, jdgmt adopted); Simms Oil Co. v. American Refining Co., 288 S.W. 163 (Tex.Comm.App. 1926); H. L. "Brownie" Choate, Inc. v. Southland Drilling Co., supra; Yelderman v. McCarthy, 474 S.W.2d 781 (Tex.Civ.App., Houston—1st Dist., 1971, error ref. n. r. e.); and Burgamy v. Davis, 313 S.W.2d 365 (Tex. Civ.App., Fort Worth, 1958, no writ).

Our study of the authorities cited by defendant does not lead us to the conclusion posited by defendant. The quotations from *Jenkins,* supra, control the disposition of the points under review.

7. Special Issue No. 1: "From a preponderance of the evidence do you find that the production of sulphur from the line wells before all the sulphur was produced that could reasonably be recovered through wells drilled on Plaintiffs' lands away from the boundary lines of others caused a loss of sulphur royalties to Plaintiffs?"—to which the jury answered: "Yes."

so advanced. Defendant offered its Assistant General Counsel as a witness upon the trial and upon cross-examination this transpired:

"Q Mr. Brown, it is quite obvious that the line wells were drilled and produced before all the sulphur that could have been reasonably recovered from tract #41 through wells that were away from the lines of others was recovered. Is that not true?

"A Quite apparently."

Defendant offered a plat of the area in question showing the sulphur development as it existed on January 1, 1956 (DX–40), which showed that, while there had been sulphur production from the "300 series" wells upon plaintiffs' lands, there had been no mining for sulphur upon the adjacent Spindletop Heights lands. The nearest well on plaintiffs' lands, No. 331, was located approximately two hundred feet from the dividing line.

Another plat offered by defendant showing development as it existed on January 12, 1968 (DX–41), showed no new wells having been drilled on either plaintiffs' lands or those of Spindletop Heights. This plat did, however, show the locations of the two original line wells, Nos. 1127 and 1128, which were "steamed" on January 12 and January 27, 1968, respectively.

Thus we find no evidence in this record of drainage of plaintiffs' lands from production obtained by defendant on the Gladys City lands *before* the drilling of the line wells. Of course, it is conceded that production from the line wells drained both tracts, but this occurred, as the jury found on the uncontradicted evidence, before all of the sulphur had been recovered from the interior of plaintiffs' lands.

■ Plaintiffs were entitled to a submission of the controlling issues supported by the pleadings and the evidence, and this was accomplished in the manner adopted by the trial court. We cannot conclude that in adopting this method of submission he committed reversible error. Cf. Westinghouse Electric Corp. v. Pierce, 153 Tex. 527, 271 S.W.2d 422, 426 (1954); Mitchell v. Greyhound Bus Lines, Inc., 409 S.W.2d 914, 916 (Tex.Civ.App., Tyler, 1966, error ref. n. r. e.).

Finding no merit in the contentions so advanced, points five through eleven are overruled.

### C. Objections to the "Diligence" Issue

■ The trial court submitted Special Issue No. 2 reading: "From a preponderance of the evidence do you find that the Defendant failed to conduct its sulphur mining operations on Gladys City Tract 41 with due diligence?"—to which the jury answered, "Yes." By points Nos. 12, 13, and 14, defendant attacks such issue as being "Global", overly broad and inclusive, a general charge, etc.[8] These points were raised by appropriate objections to the charge which were brought forward in the amended motion for new trial.

As might be expected, primary reliance is upon the line of negligence cases epitomized by Roosth & Genecov Production Co. v. White, 152 Tex. 619, 262 S.W.2d 99 (1953), and Barclay v. C. C. Pitts Sand and Gravel Company, 387 S.W.2d 644 (Tex.1965), and their progeny. We call attention to the fact that this cause was submitted under the provisions of Rule 277, T.R.C.P., before its amendment effective September 1, 1973.

We do not review a negligence case; instead, plaintiffs pleaded and established by their evidence that defendant knowingly and intentionally took affirmative steps to drill sulphur producing wells on the dividing line, thereby draining their lands, before producing the sulphur underlying the

---

8. Special exceptions addressed to the generality of the pleadings were overruled but defendant has no points of error challenging this ruling of the court.

interior of their lands. The distinction is critical when we come to a consideration of the rules governing submission of cases prior to September 1, 1973.

Justice Garwood, in *Roosth & Genecov*, supra, adverted to the divergent form of submission found in the negligence and non-negligence cases. In that case, the Supreme Court declined to adopt a uniform submission for both types of cases because: "To change it drastically by judicial decision would in our judgment cause undue confusion." Yet, the court declined to recede, even slightly, from the broad form of submission used in the "cases other than those of negligence." (262 S.W.2d at 104)

The so-called "broad form" of submission in the non-negligence field has been widely used and specifically approved by our Supreme Court. In City of Houston v. Lurie, 148 Tex. 391, 224 S.W.2d 871, 876 (1949), a single issue submitting the question of whether a building constituted a "fire hazard" was approved. The use of a single issue inquiring generally if the husband had committed acts amounting to cruel treatment was approved in Howell v. Howell, 147 Tex. 14, 210 S.W.2d 978 (1948).[9]

Associate Justice Pope of our Supreme Court has written an outstanding article for publication in the Southwestern Law Journal, Spring 1974, wherein he covers the gamut of non-negligence cases in which the broad form of submission has received judicial approval.[10] See also the line of cases mentioned in Barclay v. C. C. Pitts Sand and Gravel Company, supra, 387 S.W.2d at 652, fn. 3.

The "proper control" issue in automobile cases met a sudden and unexpected death in Barclay v. C. C. Pitts Sand and Gravel Company, supra, but it was not interred without appropriate remarks being made as to its untimely passing. See the opinions of Norvell, J. (concurring, 387 S.W.2d at 648) and Pope, J. (concurring and disagreeing in part, 387 S.W.2d at 650). For the purposes of our discussion, it is sufficient to note that *Barclay* falls in the negligence field of the law.

In the case at bar, the trial court submitted the ultimate and controlling issue with an appropriate instruction.[11] See cases cited in *Barclay*, supra, 387 S.W.2d at 654, fn. 3. Points 12, 13, and 14 are overruled.

Defendant has similar points (Nos. 18, 19, and 20) challenging the form of Special Issue No. 3, submitted contingently upon an affirmative answer to Special Issue No. 2, reading: "From a preponderance of the evidence do you find that the failure, if any, of the Defendant to conduct its sulphur mining operations on Gladys City Tract 41 with due diligence, caused a loss of sulphur royalties to Plaintiffs?" —to which the jury answered, "Yes."

For the reasons assigned in the foregoing discussion of defendant's objections to Special Issue No. 2, these points are overruled.

### D. The Evidentiary Points

Defendant attacks the jury findings in response to Special Issues Nos. 2, 3, and 4 with no evidence, insufficient evidence, and great weight and preponderance of the evidence points. In passing on the no evi-

9. Justice Garwood in *Roosth & Genecor*, supra: "[W]e do not consider that we are overruling City of Houston v. Lurie or Howell v. Howell, or even limiting their effect in cases other than those of negligence to which they might be applicable." (262 S.W. 2d at 104)

10. J. Pope and W. Lowerre, "Revised Rule 277—A Better Special Verdict System for Texas," 27 Sw.Law Jrl. 577, 583, et seq.

(1973). See specially the cases mentioned in footnotes 41–59.

11. The accompanying instruction read: "In connection with the foregoing issue you are instructed that by the term 'due diligence' is meant such reasonable diligence as would be used by an ordinarily prudent person engaged in the same undertaking under the same or similar circumstances, acting with regard to the economic interests of both Plaintiffs and Defendant."

dence points, we will consider only the evidence supporting the findings of the jury; while as to the latter, we will consider the record as a whole.

We review an extremely technical record which includes a large number of exhibits offered in an effort to make the testimony of the experts intelligible to the jury. Other records showed the location of the wells on the surface, the date of drilling and steaming thereof, the depths from which production was obtained, the amount of production, and the value of the sulphur produced. However, as applied to the questions under review, these factors did no more than form the bases which the expert witnesses used in arriving at their respective opinions. The only testimony supporting and offered in opposition to the findings of the jury in response to Special Issues Nos. 2, 3, and 4 was opinion testimony of expert witnesses.

A most authoritative discussion of the rule governing the probative force of expert testimony vis-a-vis the jury function is to be found in Broussard v. Moon, 431 S.W.2d 534, 537 (Tex.1968). Some of the pertinent holdings found therein are of special importance in reviewing the points now under discussion. It must be borne in mind that: (a) "[O]pinion testimony is but evidentiary and is never binding upon the trier of facts"; (b) it " 'does not establish any material fact as a matter of law' "; (c) "the mere qualification of a witness as an expert does not cut off the fact finder from exercising considerable judgment of his own about how far his opinions are to be relied on, it being no less so where the expert is an employee of the party for whom he testifies"; and (d) recognition must be given to "the right of jurors to weigh, and argue against, opinion testimony not comporting with their own ideas of sound logic." (All quotations are from 431 S.W.2d at 537, citations being omitted.)

One of plaintiffs' expert witnesses was Richard D. Mills, a geologist with more than twenty years of experience in the production of sulphur from piercement salt dome structure similar to that involved in this suit. Mr. Mills' qualifications are not attacked by defendant; and, his testimony covers nearly two hundred pages in our record.

Mr. Mills estimated that 125,000 tons of sulphur was drained away or left in an unrecoverable state on plaintiffs' Tract 41 through production from the line wells. He gave detailed testimony as to the factors entering into the formation of his opinion including "data, logs, and so forth" which had been provided to him covering production of sulphur from Tract 41 "[s]ince its inception." He took into consideration the relative density of the drilling operations when the "300 series" of wells were being produced in the nineteen fifties and continued:

> "[I]f we project over the entire lot #41, acreage tract #41, Gladys City, the methods employed in 1955 and 1956 and the results obtained then [interruption of counsel omitted], that we would have realized approximately 125,000 tons more production creditable to Gladys City than was credited the way production was effected."

He explained that a more complete exhaustion of the underlying sulphur is brought about by the drilling of the wells close together as was done in producing the "300 series" of wells, and that the original method of development was "a proper way."

■ Cross-examination developed the underlying mathematical formula applied by Mills in estimating the loss of plaintiffs but, in our opinion, such did not destroy the probative value of his testimony, going only to the weight thereof.

Plaintiffs also offered the testimony of Albert H. Melsheimer, a consulting geologist and a vice-president of DeGolyer and McNaughton, who had prior experience in the sulphur industry. He gave estimates

of the sulphur either drained from plaintiffs' Tract 41 or left unrecoverable therein ranging from 70,000 to 131,000 tons, depending upon the approach taken. One method of approach was through the use of computers, programmed in accordance with the production under the "300 series" method, to determine the recoverable sulphur under Tract 41.

Defendant attacks this "so-called sweep pattern" as being theoretical and suggests that there is no way of establishing its accuracy "since the property was never drilled on that pattern." Again, the complaint is addressed not to the admissibility of the opinion based thereon, but to the weight to be given such testimony by the trier of the facts.

■ Defendant's no evidence points, Nos. 15, 21, and 24 are overruled.

Although defendant offered three expert witnesses, it principal expert was Royce Northcutt, a long time employee and production foreman on Tract 41 during the production of the line wells.[12] Although not a college trained geologist, he was very familiar with sulphur production technique and qualified as an expert witness. Through the use of well logs, production data, maps, and a three-dimensional exhibit, this witness literally "drilled" the series of line wells before the jury. Such testimony is extremely difficult to follow and understand and, as defendant says, "a great deal more interesting in person than by written record."

It was Mr. Northcutt's opinion, as we understand the record: (a) the plaintiffs' lands were properly developed under the terms of the contract; (b) all commercially recoverable sulphur thereunder was produced and the proper royalties paid there-on; (c) that reasonable diligence was used in the development of such lands; and (d) that sulphur underlying the Spindletop Heights lands actually drained into the line wells to plaintiffs' benefit rather than drained *from* plaintiffs' lands. In short, Mr. Northcutt's testimony, if accepted by the trier of the facts, would have supported a verdict for defendant.

Mr. Northcutt also used an additional factor in arriving at his opinion, and one not used by plaintiffs' witnesses—a map showing surface subsidence.[13] These maps showed areas of subsidence upon the lands of Spindletop Heights subdivision and defendant argues that this was almost conclusive proof of the production from those lands, i. e., drainage of Spindletop Heights rather than the lands of plaintiffs. This contention was weakened, at least to some extent, by Mr. Northcutt's admission that he was unable to estimate what portion of the subsidence was due to the extraction of oil and salt water from the subsurface formation and what portion was due to the extraction of sulphur. It was his opinion, however, that the removal of oil did not cause subsidence since the oil is replaced by salt water.

Defendant brought Theo R. Trahan, a long time production superintendent and manager of Jefferson Lake Sulphur Company, who qualified as an expert witness upon the production of sulphur from salt dome structures on the Gulf Coast. He had been retained by defendant "to evaluate their operation and to evaluate their conduct" in producing from the area in question in this suit. It was his opinion that the development of the area through production from the line wells, with the royalties being divided equally, was the proper method of development; that the method used was effective and efficient;

12. Northcutt worked under defendant's production superintendent, Zemanek, who determined to locate and produce the line wells before resuming production from the interior of Tract 41. Mr. Zemanek, retired from defendant's employ and living in Houston at the time of the trial, did not testify.

13. For a description of this phenomenon, see Kenny v. Texas Gulf Sulphur Company, 351 S.W.2d 612 (Tex.Civ.App., Waco, 1961, error ref.).

that there was a possibility of additional or residual sulphur underlying plaintiffs' lands; and that more than half of the production from the line wells came from the Spindletop Heights property and not from plaintiffs' lands. He testified that he used the subsidence maps to corroborate his opinions.

Defendant's other expert witness was X. T. Stoddard, a long time employee of Duvall Corporation, a producer of sulphur in Texas, as well as other corporations engaged in the same field. He too had been retained by defendant to evaluate the techniques and production procedures used by defendant in the production of sulphur from Tract 41, to determine "whether or not they were accepted . . . customary reasonable procedures." He found defendant's methods to have been proper and customary and testified that more than half the sulphur produced from the line wells came from the Spindletop Heights area rather than plaintiffs' lands. He also admitted that at the time the first line well was drilled, a large quantity of recoverable sulphur was underlying plaintiffs' tract which could have been produced by interior wells.

Having reviewed the voluminous record, including the testimony of each of the expert witnesses, and following the usual rules governing such review [see, e. g., Garza v. Alviar, 395 S.W.2d 821 (Tex. 1965)], we are of the opinion that issues of fact were presented for determination of the jury under the rationale of Broussard v. Moon, supra. Points 16, 17, 22, 23, 25, and 26 are overruled.

Finding no reversible error, the judgment of the trial court is affirmed.